J-S04036-21

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| D.A.T. | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| R.M.T. | : | |
| | : | |
| Appellant | : | No. 1383 MDA 2020 |

Appeal from the Order Entered September 30, 2020
In the Court of Common Pleas of Schuylkill County Civil Division at
No(s):  S-841-2020

BEFORE:  OLSON, J., STABILE, J., and MUSMANNO, J.

MEMORANDUM BY MUSMANNO, J.:                    **FILED MAY 04, 2021**

R.M.T. ("Father") appeals from the custody Order regarding his daughter, H.T. ("Child") (born in December 2014), with D.A.T. ("Mother"), pursuant to the Child Custody Act ("the Act"),[1] 23 Pa.C.S.A. § 5328(a), that awarded shared legal custody to Father and Mother, primary physical custody to Mother, and partial physical custody to Father, in accordance with a schedule.  We affirm.

In its Opinion, the trial court set forth the relevant factual history and summarized the testimony presented during the custody hearing.  ***See*** Trial

_____

[1] ***See*** 23 Pa.C.S.A. §§ 5321-5340.

Court Opinion, 9/30/20, at 1-24. We adopt the trial court's recitation as though fully restated herein. *See id.*[2]

On September 30, 2020, the trial court entered a custody Order awarding shared legal custody to Father and Mother, primary physical custody to Mother, and partial physical custody to Father, in accordance with a schedule. On October 28, 2020, Father timely filed a Notice of Appeal, along with a Concise Statement of errors complained of on appeal, pursuant to Pa.R.A.P. 1925(a)(2)(i) and (b).

In his brief on appeal, Father raises the following issues:

1. Did the [t]rial [c]ourt err and abuse its discretion when it granted primary physical custody of [Child] to Mother[,] in light of the analysis of the custody factors?

2. Did the [t]rial [c]ourt err and abuse its discretion in finding that the fourth custody factor[,] addressing the need for stability and continuity in the child's education, family life and community life[, 23 Pa.C.S.A. § 5328(a)(4),] was a neutral factor and did not weigh in favor of either parent?

3. Did the [t]rial [c]ourt err and abuse its discretion in finding that the custody factor of sibling relationships[, 23 Pa.C.S.A. § 5328(a)(6),] weighed in favor of Mother?

4. Did the [t]rial [c]ourt err and abuse its discretion in finding that custody factor of whether a parent has attempted to turn the child against the other parent[, 23 Pa.C.S.A. § 5328(a)(8),] weighs in favor of Mother?

5. Did the [t]rial [c]ourt err and abuse its discretion in finding that the factor regarding each parent's availability to care for the child

---

[2] We caution the trial court against the use of inflammatory language in reference to the COVID-19 pandemic.

or ability to make appropriate child-care arrangements[, 23 Pa.C.S.A. § 5328(a)(12),] weighs in favor of Mother?

6. Did the [t]rial [c]ourt err and abuse its discretion in finding that the level of conflict between the parties[, 23 Pa.C.S.A. § 5328(a)(13),] weighed in favor of Mother?

Father's Brief at 9-10.

We will address Father's claims, each of which challenges the trial court's determination of the custody factors set forth at section 5328(a), together. Regarding subsection 5328(a)(4), Father argues that the trial court improperly concluded that the need for stability in Child's education, family life and community life is a neutral factor. *Id.* at 48. According to Father, he can provide greater stability because he owns his home and has a local extended family. *Id.* Father also argues that Child has community support through Father's church. *Id.* at 49.

Regarding subsection 5328(a)(6), Father contends that the trial court abused its discretion in concluding that Child's sibling relationships weigh in favor of Mother. *Id.* at 50. Father argues that Child has bonded with her step-siblings, and "[t]here is no evidence to suggest that … [C]hild sees her half-brother with Mother any differently than she sees her step-siblings with Father." *Id.* at 51-52.

As to subsection 5328(a)(8), the attempts of a parent to turn the child against the other parent, Father claims that the trial court abused its discretion by determining that this factor weights in favor of Mother. *Id.* at 52. Father acknowledges making "negative comments" toward Mother's fiancé, but

argues that both men were at fault. *Id.* at 52-54; *see also id.* at 54 (stating that "[t]here is no doubt that all parties have engaged in inappropriate behavior.").

Father claims that the trial court erred in finding that Mother is more available to care for Child or make appropriate child-care arrangements, pursuant to subsection 5328(a)(12). *Id.* at 54. According to Father, "[t]he evidence presented at the hearing shows exactly the opposite." *Id.* at 54-55. Father argues that his work schedule is more flexible than Mother's schedule, and he was able to change his work schedule in order to be available for Child after school hours. *Id.* at 56. Father claims that Mother's fiancé is strict and sometimes upsets Child. *Id.* at 57-60. Further, Father asserts that it is "imperative to note that Mother failed to testify in any way about … [C]hild's muscular dystrophy. … Mother's failure to even mention this condition during her testimony called into question whether she is able to make appropriate child-care arrangements." *Id.* at 60-61.

Finally, regarding subsection 5328(a)(13), Father argues that the trial court erred in finding that the level of conflict between the parties weighs in favor of Mother. *Id.* at 65. Father claims that "Mother has frequently refused to answer or communicate with Father regarding … [C]hild." *Id.* at 65. According to Father, Mother fails to communicate with him about Child's medical concerns. *Id.* at 65-66. Further, Father contends that the conflict

between the parties worsened after he and Mother's fiancé had an argument. *Id.* at 68-69.[3]

> In custody cases under the Act, our standard of review is as follows:
>
> In reviewing a custody order, our scope is of the broadest type and our standard is abuse of discretion. We must accept findings of the trial court that are supported by competent evidence of record, as our role does not include making independent factual determinations. In addition, with regard to issues of credibility and weight of the evidence, we must defer to the presiding trial judge who viewed and assessed the witnesses first-hand. However, we are not bound by the trial court's deductions or inferences from its factual findings. Ultimately, the test is whether the trial court's conclusions are unreasonable as shown by the evidence of record. We may reject the conclusions of the trial court only if they involve an error of law, or are unreasonable in light of the sustainable findings of the trial court.

*C.R.F. v. S.E.F.*, 45 A.3d 441, 443 (Pa. Super. 2012) (citation omitted); *see also Bulgarelli v. Bulgarelli*, 934 A.2d 107, 111 (Pa. Super. 2007) (stating that "[a]n abuse of discretion is not merely an error of judgment; if, in reaching a conclusion, the court overrides or misapplies the law, or the judgment exercised is shown by the record to be either manifestly unreasonable or the product of partiality, prejudice, bias or ill will, discretion has been abused." (quotation omitted)).

> We have stated that
>
> [t]he discretion that a trial court employs in custody matters should be accorded the utmost respect, given the special nature of the proceeding and the lasting impact the result will have on the lives of the parties concerned. Indeed, the knowledge gained

---

[3] Father does not challenge the trial court's findings as to the remaining custody factors.

by a trial court in observing witnesses in a custody proceeding cannot adequately be imparted to an appellate court by a printed record.

***Ketterer v. Seifert***, 902 A.2d 533, 540 (Pa. Super. 2006) (quoting ***Jackson v. Beck***, 858 A.2d 1250, 1254 (Pa. Super. 2004)).

With any custody case decided under the Act, the paramount concern is the best interests of the child. ***See*** 23 Pa.C.S.A. §§ 5328, 5338. Section 5323 of the Act provides for the following types of awards:

**(a) Types of award.--**After considering the factors set forth in section 5328 (relating to factors to consider when awarding custody), the court may award any of the following types of custody if it in the best interest of the child:

(1) Shared physical custody.

(2) Primary physical custody.

(3) Partial physical custody.

(4) Sole physical custody.

(5) Supervised physical custody.

(6) Shared legal custody.

(7) Sole legal custody.

23 Pa.C.S.A. § 5323.

Section 5338 of the Act provides that, upon petition, a trial court may modify a custody order if it serves the best interests of the child. 23 Pa.C.S.A. § 5338. Section 5328(a) sets forth the best interest factors that the trial court must consider. ***See E.D. v. M.P.***, 33 A.3d 73, 80-81, n.2 (Pa. Super. 2011). Trial courts are required to consider "[**a**]ll of the factors listed in section

- 6 -

5328(a) … when entering a custody order." *J.R.M. v. J.E.A.,* 33 A.3d 647, 652 (Pa. Super. 2011) (emphasis in original).

Section 5328(a) of the Act provides as follows:

**§ 5328.  Factors to consider when awarding custody**

**(a) Factors.--**In ordering any form of custody, the court shall determine the best interest of the child by considering all relevant factors, giving weighted consideration to those factors which affect the safety of the child, including the following:

(1) Which party is more likely to encourage and permit frequent and continuing contact between the child and another party.

(2) The present and past abuse committed by a party or member of the party's household, whether there is a continued risk of harm to the child or an abused party and which party can better provide adequate physical safeguards and supervision of the child.

(2.1) The information set forth in section 5329.1(a)(1) and (2) (relating to consideration of child abuse and involvement with protective services).

(3) The parental duties performed by each party on behalf of the child.

(4) The need for stability and continuity in the child's education, family life and community life.

(5) The availability of extended family.

(6) The child's sibling relationships.

(7) The well-reasoned preference of the child, based on the child's maturity and judgment.

(8) The attempts of a parent to turn the child against the other parent, except in cases of domestic violence where

reasonable safety measures are necessary to protect the child from harm.

(9) Which party is more likely to maintain a loving, stable, consistent and nurturing relationship with the child adequate for the child's emotional needs.

(10) Which party is more likely to attend to the daily physical, emotional, developmental, educational and special needs of the child.

(11) The proximity of the residences of the parties.

(12) Each party's availability to care for the child or ability to make appropriate child-care arrangements.

(13) The level of conflict between the parties and the willingness and ability of the parties to cooperate with one another. A party's effort to protect a child from abuse by another party is not evidence of unwillingness or inability to cooperate with that party.

(14) The history of drug or alcohol abuse of a party or member of a party's household.

(15) The mental and physical condition of a party or member of a party's household.

(16) Any other relevant factor.

23 Pa.C.S.A. § 5328(a).

Further, we have explained as follows:

Section 5323(d) provides that a trial court "shall delineate the reasons for its decision on the record in open court or in a written opinion or order." 23 Pa.C.S.A. § 5323(d). Additionally, section 5323(d) requires the trial court to set forth its mandatory assessment of the sixteen Section 5328(a) custody factors prior to the deadline by which a litigant must file a notice of appeal. …

In expressing the reasons for its decision, there is no required amount of detail for the trial court's explanation; all that

is required is that the enumerated factors are considered and that the custody decision is based on those considerations. A court's explanation of reasons for its decision, which adequately addresses the relevant factors, complies with Section 5323(d).

*A.V. v. S.T.*, 87 A.3d 818, 823 (Pa. Super. 2014) (brackets and some citations omitted).

In its Opinion, the trial court addressed each of the relevant custody factors,[4] and we adopt its reasoning for the purpose of this appeal. *See* Trial Court Opinion, 9/30/21, at 24-32. It is apparent that Father's challenge is strictly to the weight that the court assigned to certain factual testimony of the parties, and the trial court's credibility determinations. Considering all of Father's issues together, Father simply would have preferred for the trial court to have placed more weight on testimony favoring him. As we explained above, with regard to issues of credibility and weight of the evidence, we must defer to the presiding trial judge who viewed and assessed the witnesses first-hand. *C.R.F.*, 45 A.3d at 443; *see also M.J.M. v. M.L.G.*, 63 A.3d 331, 339 (Pa. Super. 2013) (stating that "[i]t is within the trial court's purview as the

_____

[4] We note that, while the trial court did not specifically address subsection 5328(a)(2.1), there is nothing in the certified record that would suggest information relating to consideration of child abuse and involvement with protective services, which would be considered under subsection 5328(a)(2.1). Further, the trial court did not discuss any additional relevant factors under subsection 5328(a)(16).

finder of fact to determine which factors are most salient and critical in each particular case.").[5]

After a careful review of the record, we conclude that, in making its determinations on the best interest factors, the trial court properly considered all of the credible testimony from the witnesses, and determined the weight to assign to each of these factors. The trial court's conclusions are not unreasonable, and are supported by the record. We discern no error of law or abuse of the trial court's discretion. Thus, we will not disturb the trial court's Order.

Order affirmed.

Judge Stabile joins the memorandum.

Judge Olson concurs in the result.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 05/04/2021

---

[5] Moreover, to the extent that Father asserts that the trial court failed to consider that he had step-children who should have been considered as Child's siblings, the trial court Opinion makes clear that the court was aware of the recent addition of step-siblings to Child's life when Father married L.S. in August 2020, and chose not to afford them the same weight as Child's sibling relationship with her half-sibling, H.K., in this instance.

Received 11/17/2020 8:57:26 AM Superior Court Middle District

Filed 11/17/2020 8:57:00 AM Superior Court Middle District
1383 MDA 2020

COURT OF COMMON PLEAS OF SCHUYLKILL COUNTY
CIVIL ACTION – LAW

D.    A. T                                         :       No. S-841-20
                        Plaintiff                  :
                                                   :
              vs.                                  :
                                                   :
R      M. T                                        :
                                                   :
                        Defendant      :       CUSTODY

Russell Farbiarz, Esquire – for Plaintiff
Rebecca Smith, Esquire – for Defendant

**OPINION OF COURT**

DOLBIN, J.

This matter involves a Petition to List the Matter for Trial and for Special

Relief by Mother, D    A.T          ("Mother") regarding the parties' minor

child,            DOB 12/  /14 (          or "child"). Mother originally

filed for custody in 2019 in Berks County, Pennsylvania and that Court entered an

Order dated May 7, 2019 granting shared legal custody to Mother and Father,

R. M.T          ("Father") and also shared physical custody on a monthly basis

between Father, who resides in Michigan, and Mother. Mother subsequently filed

a petition to List the Matter for Trial and for Special Relief; however, because

Mother had moved to Schuylkill County, Berks County no longer had jurisdiction

and the matter was transferred to Schuylkill County in June of 2020. On July 15,

2020, Mother's counsel filed a Petition to List the Matter for Trial and for Special

Relief asking for various remedies. The parties attended a conference at which the paramount issue then became where the child would attend school.

We held a custody trial on August 19, 2020. Mother testified first. Child was born in Grand Rapids, Michigan. Mother left Michigan in 2017 to relocate to Pennsylvania for employment purposes. Father knew that she was planning to move. There was an incident where Father became argumentative and physical with Mother because he did not want her to move. He threatened to kill her and parked his vehicle behind hers so she could not leave, and took her keys away. Mother was unable to contact the police right away and by the time she did, there was nothing she could do. During the incident, Father punched her in her stomach and then blockaded the home. Father made numerous comments to Mother that he would hurt her and hurt people at work. Mother was not concerned for herself, but was concerned as to how Child would be raised in that environment. Mother is concerned about Father's religious beliefs and personality. Father likes thinner women and Mother believes that Child does not eat because Child is concerned about getting fat. Child holds her stomach when she returns from Father's care. Child is only five years old.

Mother came to Pennsylvania as the final straw. Mother is trained as a hystotechnologist. Her field is in a very specific area and there was a very small pool of jobs in that field in Michigan. Mother asked Father to move but Father objected. Mother could not get a job in Michigan. Mother got a job in Pennsylvania and moved in July of 2017. Mother was worried that her

2

certifications would expire and that would hurt her chances of gaining employment. Mother moved to Oley, in Berks County. Mother rented an apartment outside of Reading, in the country. Child was 2 ½ years old at the time they moved. Mother did not know anyone in the area. Mother did not believe Father was happy about this move, but he kissed both of them good-bye when they left.

Mother now lives in Pottsville, Pennsylvania. The home is a brick bi-level with three floors, three bedrooms and a fenced yard. There is a neighborhood and the neighbors are a tightknit group and support each other. Child has her own bedroom. Mother introduced pictures of the home. Mother has lived there for one year. She moved from Oley because she met her fiancé, D     K          . D.K. asked her to move in with him. Mother works at the Geisinger Medical Center in Danville, Pennsylvania and she is now closer to work. D.K. and Mother have a son, H      , who is one year old. They are planning to get married on October 3. Child will be the flower girl. Mother would like to have custody of Child for the wedding. They met 2 ½ to 3 years ago and started dating 2 ½ years ago.

They separated for a time because they were unsure about their relationship and wanted to be with other people, but got back together. While they were separated, Father asked to come to one of Child 's doctors' appointments. While they were there, D.K. 's brother arrived at the same office. It was a strange coincidence and mother joked with Father that D.K. was following her. D.K.

3

has never physically or verbally abused Mother. They have agreed not to use physical punishment with Child, rather, she has timeouts, she is sent to her room, or she has to "run a lap." D.K. and Mother run a strict home. Child has chores, such as washing the dishes or making her bed every morning. If Mother is not home, and Child is acting up, D.K. contacts Mother. Child complains all of the time about having to do chores because she does not have any chores at Father's home.

H was born on July 20, 2019. Child adores him. When Child is at Father's and it is time for Child to FaceTime with Mother, Child only wants to speak to "Bubba."

Mother has no relatives in Pennsylvania. She has a brother in Michigan but does not have his phone number. They talk via Face Book. D.K. has two sets of parents. Mother is close to D.K.'s mother and calls her every day on the way to work, particularly with the wedding coming up. She is ten minutes away. D.K.'s siblings are supportive. Mother is good friends with D.K.'s sister. They all help with Child and D.K.'s mother is keeping Child for the honeymoon. D.K.'s father also helps watch Child. They all attended H's birthday party. Both of D.K.'s siblings have children and they are all close in age. They are attending kindergarten together. Before COVID-19, the cousins saw each other every other weekend.

Mother works second shift from 3:00PM to 11:30PM. She is with Child to do school work. She leaves for work around 1:30PM and returns home around

4

12:30AM the next morning. H       wakes up around 6:30AM. D.K.    works for the Reading, Blue Mountain and Northern Railroad, typically 7:00AM to 5:00PM, every day except Wednesday and Sunday. They have a babysitter, M G    , four days each week. They found her through care.com. Mother has looked into switching to a day shift. Mother is trying to figure out how to work and also how to educate Child if part of her school education is online. Mother is more than willing to help Child with school.

On a typical work day, Mother wakes the children, they have breakfast together, they go for a walk, then have lesson time. H       takes a nap, and Child has quiet time, and they watch a movie. They then have lunch, and Mother gets ready for work. When the babysitter arrives, she kisses the children and leaves for work. D.K. is home about 3-4 hours later. D.K. gets dinner for the children, and gets them ready for bed. Bedtime is at 8:00PM.

Saturdays are family days. Sundays, D.K. works. Mother has the children all day by herself until dinner.

Both parents take Child I to the dentist and doctor in their respective states. Recently, Child has developed a hearing issue. Father was concerned that Child failed a hearing test. Mother took Child for a test and she passed. They are taking Child to a specialist. Mother usually texts Father about Child. Father does not communicate about Child 's doctor visits in Michigan and she does not know the names of the doctors there because Father has not told her. Mother found out that Child was in the emergency room at a hospital in Michigan because the hospital

5

emailed her. When she called Father, he wanted to know how Mother found out. Mother and Father have had a long battle about vaccinations for Child. Father's religion does not agree with vaccinations. Father has had strong words with a doctor about it, creating a tense atmosphere, after which the doctor left the room. Now that they are in court, Father has agreed to have Child vaccinated.

When Mother and Child moved to Pennsylvania, Father came to visit for a half day on Christmas Eve and left on Christmas Day. Mother had been in Pennsylvania for six months by that time, and that was the first that Father requested to see Child. In February of 2018, Child went to Michigan for a two week visit. Mother filed for divorce and custody in Berks County. In 2018 they came to an agreement on custody, with Father having every other weekend, which he exercised. In 2019, they agreed to share legal and physical custody, on a monthly rotation, which was entered as a temporary order of court.

The custody schedule has worked well for the parents but not for She has trouble adjusting between the two different routines. During Mother's time, Child attends preschool in Pottsville. It is difficult for Child to adjust to Mother's routine when she returns from Father's. It takes Child about a week to get back into it.

When the Covid virus shutdown started, Mother asked Father to keep Child there for her in Michigan for her health and safety. Then, when they resumed custody exchanges, Father would not agree to give Mother his month, so Father

6

kept Child for three months in a row. Father has only offered Mother more time if Mother does not file court papers. Mother finally got Child back in early June.

Sometimes Father has friends who reside in Pennsylvania drop Child off. Mother does not know these people and does not know how long they have had Child. Other than indicating they were friends through church, they would not answer Mother's questions.

At one exchange, D.K. accompanied Mother and there was an incident with Father. Both H     and Child were present. D.K. has a concealed carry permit and wore his weapon to the exchange. Father asked D.K. if he was trying to intimidate Father. Father asked 'D.K. if he wanted to fight. D.K. got Child out of the car, while Father went and retrieved a gun from Father's car. Father said he was "done" and pointed the gun at D.K.'s head. D.K. never removed the gun but walked to the car and put his gun in the glove box. Child witnessed this. D.K. walked toward Father, who was now filming D.K. . The police were called.

Father regularly says horrible things about Mother, D.K., and H     . Father then waits for a negative reaction from D.K. and films it using his phone.

When Child is with Father, she is taken between three different homes; Father's home, Father's new wife's home, and the paternal grandmother's home. Child stays with her paternal grandmother during the week. Mother does not want Child staying there because one of Father's siblings lives there and uses drugs and

has a poor attitude. Twice, Child has returned to Mother with head lice. Child is disheveled and dirty, and her hair is not brushed.

Father recently remarried. Father had one other prior fiancé. Mother had to ask Father about these women in Child 's life, who Child bonded with. Mother found out Father was engaged from a FaceBook post in March 2020. Father's mother has not met her.

Mother would like Child to live with her during the school year and with Father for the summer, except for one two week period. Father should also have week-long school vacations/breaks.

On cross-examination, Mother testified that she moved to Oley in July of 2017, lived there for five months, moved to Douglasville, lived there for seven months, and then moved to Pottsville. She has lived in Pottsville for three years. The home is owned by D.K.  brother C)      K(         . C.K. lives with his girlfriend. She and D.K. pay the mortgage and when they marry, the house will be placed in both of their names. They do not have a written agreement regarding this.

Father did not allow Child to come to Mother's for H    s first birthday party. Father has asked about school options for Child including homeschooling, so they could continue monthly exchanges. Mother does not agree. Child needs a stable environment and not to keep going back and forth every months.

Mother and D.K. ( were separated for two weeks, during which time Father attended one of Child 's doctor appointments. After ( D.K. 's brother C.K.

8

showed up at the same doctor's office, Mother told Father that D.K. was "controlling." Mother told Father she thought D.K. was having someone follow her. Mother told Father that D.K. was "rigid." Child has expressed concern about D.K.'s rules. She keeps to a strict schedule. D.K. does not allow Child to consume an entire bottle of ketchup during a meal; he restricts her to a generous portion. They are also Mother's rules. D.K. has made Child clean up when she makes a mess. D.K. at that time had not yet had a child. D.K. did not let Child play with an umbrella in the house. Child gets upset with D.K.'s restrictions. D.K. took a blanket away from Child and replaced it with a new one. Child became very upset. In early 2020, Child was losing a tooth and Mother and D.K. tied a string around the tooth and attached the other end of the string to a doorknob and D.K. shut the door. Child became very upset about that. Mother knows that Child tells Father that D.K. is "very mean."

D.K. and Father have issues. D.K. said things to Father after Father walked into their home. At the custody exchange where the guns were drawn, D.K. did not hit Father, He swiped at Father's phone to have him stop recording, and the phone hit Father in the face. D.K. called Father Names and threatened him.

Mother believes that at Pottsville, Child will get on the bus at 8:15AM and get off at 3:45PM. D.K. is home around 5:30Pm and will make dinner and help with homework. Mother will only see Child for a short time in the morning.

9

However there may be days of remote learning and Mother will be there, and the babysitter will take over when Mother leaves for work.

Mother agrees that Father has a large family in Michigan, that Child has numerous cousins there, and that she can ride horses at her grandmother's. Mother does not suffer from any mental health issues but may have suffered from postpartum depression after H    's birth.

D.K. has said words about defending the house and shooting people who enter, including Father, in front of Child. At the time, D.K. was trying to teach Child not to open the door.

When Mother left for Pennsylvania, Father was present at the home. Mother gave Father her address in Oley. Mother did not drain their bank account. Mother started working in Danville in October of 2019. It is a one hour commute. Mother never filed for a Protection from Abuse Order for Father and never reported his threats to the police. Mother agreed that despite multiple custody proceedings, Mother did not raise these allegations until today.

Mother agreed that under the first custody order, Father visited Child every other weekend, despite the distance. Mother does not agree that she and Father had good communication about Child in the past. Mother only disclosed the private information about D.K. to Father in regard to how to handle Child, not to bring Father into a personal issue. When H    was born, Child was with Father. When Child returned, she brought gifts for H   , which Mother threw away. Mother sent Father a text not to send gifts. It was the context of the gifts

10

that caused this. The gifts were not from Child   The gifts were not a kind gesture.
Mother did not throw the gifts away in front of Child, who was excited about the
gifts and the baby.

Child alls D.K. by his name. They do not encourage Child to call
D.K. daddy.

On redirect, Mother testified that she believes she is secure in her current
living arrangement and knows she will qualify for a mortgage. Mother and D.K.
agree on the larger rules for Child, including bedtime and chores. Child will eat an
exuberant amount of ketchup. D.K. is helping Mother to help Child eat less
ketchup by placing a set amount on her plate and using it throughout the meal.
Child complains about D.K. They have discussed it as a family. D.K. is
trying to set Child up for success later. Child lives at places that have different
rules. D.K. was raised in a strict environment. Mother denies he is controlling.
Child 's baby blanket was in pieces. D.K. told Child that she is a big girl now
and no longer needs a baby blanket. The blanket was disgusting. It was not meant
to be a vindictive move or punishment by D.K.

D.K. 's statements to Father have always been in reaction to Father's
actions or words. Father walked into their home when D.K. was not home.
Mother admitted D.K. made verbal threats to Father about what D.K. would
do to him if he did that again. Father called Mother terrible names when she
became pregnant and also about D.K. Mother thought the toys were from
Father and based on his comments during the pregnancy, threw them away.

11

Next, ' D.K. estified. He is Mother's fiancé and Child is like his best friend. He is not Child's father and __' calls him ' D.K. Child chose that. Father works everyday but Wednesday and Saturday. Father comes home and relieves the sitter. They have dinner around 6:00PM. He will make dinner if Mother did not get it ready. Father will ask Child how her day was. They eat together. They play outside. The house has a fenced-in yard and a pool. They play on the swing and walk in the neighborhood. They get ready for bed around 7:00-7:30PM, and are in bed around 8:00-8:30PM. With two children, it depends on how things go. If D.K. has to discipline Child, he first asks Mother. usually tells Child to go to her room or to wait until Mother gets home. Sometimes Child is made to exercise.

D.K. went with Mother and H to exchanges until earlier this year. He does not want to ever again be present for one. D.K. i would drive to relieve Mother. That day, Father was there when they arrived. Mother checked on H and Father unbuckled Child. Father started the argument, asking whether ι needed a gun to intimidate Father. D.K. said "right." Father became loud and angry. Father pushes D.K. 's buttons. This was not their first encounter. Father asked D.K. if he wanted to fight, and got a gun out of his car, pulled the magazine out and back in, cocked the gun and pointed it at D.K. 's head. walked to his vehicle without drawing his gun, which had no round in the chamber, and put his gun in the glove box. He then walked over to Father and screamed at Father because Child was standing next to D.K when Father drew

12

his gun. Father was videotaping the argument without D.K. 's consent. The police arrived. Father pushes D.K. 's buttons every time. Father makes comments in Child s presence, at D.K. 's house, while Mother was pregnant, that are repugnant.

D.K. is not a violent person and has no criminal record. He has never been the subject of a PFA order. His father and stepmother live nearly, about five minutes away. D.K. treats Haley like his own child and supports Mother having primary custody.

On cross examination, D.K. testified that he was charged with assault during an incident at his father's home but the charges were later dropped. D.K. has rules at the home, such as Child may not play with toys that the baby could choke on. Child should play with her toys. Child is allowed to have ketchup and can have more if she says "please." Child used to get upset if she had to clean up after herself but now is doing much better. D.K. denied saying certain things about Father. D.K. did get in Father's face during the custody exchange but did not strike Father. D.K. has a license to carry and has every right to carry a gun. D.K. has two safes for his guns and hunting rifles at the house.

D.K. is aware that Child complains to Mother about him. Child also says thing about Father. D.K. does not believe that he is overly strict with Child. D.K. cares for her every night until Mother returns home at 12:30AM. Child was very upset when D.K. took her old blanket away but now loves her new one.

13

At that point, Mother rested. Father called his new wife, L    St        r

). She is thirty-three years old and has no criminal record, Children &

Youth or PFA involvement. She has known Father for over two years. They

began living together earlier this year, and she is now selling her home. With the

pandemic, it has been difficult to get contractors. She and Father married on

August 8. They planned to marry earlier but were unable to do so. She has two

children, Mi      · age 11, and St        , age 3. · ᔐ ·_ · met Child first and has

bonded with her. Mi      ı does gymnastics with Child. They have fun and fight

like sisters do. M       ı made a special box with an outfit in it for Child. Father

and Child have a good relationship. Child loves Father. They do a lot of outdoor

activities and go to a nature center. Most indoor activities are closed. They have a

routine and joke around a lot. LS. has never heard Father comment on a woman's

weight. Child will say something about food at dinner and LS tells Child hat

healthiness is all shapes and sizes because it is very important that young girls

have a healthy self-image.

Father is a positive figure in Child 's life. LS. has been able to co-parent

with her children's father. Father and Mother do not have that possibility. LS.

believes they are both at fault. LS. would not just sit there and let Father decide

everything. She is not a wallflower. She and Father present a united front but they

have a lot of conversation behind closed doors.

LS is Child 's stepmother, not mother. LS. advocates on Child 's behalf

to both parents. LS · and Child like to cook together and work in the garden. LS.

helps Child with her nails and hair. In the morning, they snuggle. Child is an early riser. They make toast and tea.

Father has never been physically or verbally abusive to LS. LS. would not tolerate that. Child did have a lice issue. Child's cousins received a notice from school right before the schools closed Child was with the paternal grandmother and a cousin and got head lice. Regular lice medication did not work. According to the internet, this was some type of "super strain" of lice. LS. was unable to call the doctor for a prescription because everything was in total crisis from the shutdown from March through May. LS: could not get an appointment for Child, not even a triage nurse would see her.

LS. works as an investment banker for JP Morgan Chase. She works from 8:30AM until anywhere between 4:00 and 6:00PM. She gets one weekday off and works a half day on Saturdays. She has worked as an investment banker for ten years, but took time off to get a master's degree and teach as a professor.

Child is already enrolled at the Living Stones Academy, where LS.'s daughter attends school. It is a small Christian school, non-denominational, that has one class per grade and a maximum of 20 students per class. M has flourished there. She is on the spectrum of autism and needs support. M. was at a larger school prior to Living Stones, and Living Stones is more supportive.

LS. would like to have a relationship with Mother in regard to Child

15

On cross examination, L.S. stated that she became involved with Father in 2019 and they did not live together until March of 2020. She was not around Haley prior to that. She has not met Father's mother, C       T      . She and Father have a close relationship and she knew they were engaged.

L.S. and Father are moving to Plainwell from Grand Rapids. They go back and forth while working on the house. )       has been to both homes. Haley last stayed overnight with her paternal grandmother in May. Father often stays there also. It is a 45 minute drive from Plainwell to the school. There is a public school in Plainwell but they want the girls to attend the same school. Both L.S. and Father have family in Grand Rapids.

Child calls L.S. by her name, or "momma L    ." L.S. is able to take the girls to school but cannot pick them up except on her one weekday off from work.

Next, Father testified. He lives in Plainwell, Michigan. He used to live at his parents' home. He bought land along a river that has ponds, woods, chickens and ducks, and where he could have his dream home. Father introduced pictures. Father purchased the home in 2018. They are getting ready to sell L.S.'s home.

Father put in a beach at his home as an engagement present to L.S., when she asked him to do it for the children. Child is Father's only child. There are neighbors nearby and their church is about eight miles away. They enjoy the support and friendship.

Child suffers from muscular dystrophy. Mother did not bring this up when she testified. Child suffers from mobility issues and must stay active. Otherwise,

16

her muscles will waste away. She is sensitive to pain. Child has had several doctors' visits. She needs physical therapy; she had it prior. She needs this at regular intervals. Child recently failed a hearing test. Father has noticed that she sometimes stares off into space and they snaps out of it when her name is repeated. Child failed the test in both ears. Father told Mother. Mother took Child for a test, which she passed, but Mother is taking Child to a specialist. This is a typical response by Mother to a medical issue with Child. Child has yeast infections. Father has taken Child to several doctors and has talked to Mother. Mother treats it as no big deal. When Father asked her about it, she said she uses an ointment. Father had no idea Child had this issue until he found out that Child had it.

Father has no physical or mental health issues and no criminal, Children & Youth or PFA record. Mother has no physical issues but suffers from depression since her mother passed away. Father denied that his marriage to L.S. was quick or rushed. Father testified that L.S. asked to be married, and Father's proposal was more like a business meeting. Father loves L.S. very much. Father engages in outdoor activities with L.S.'s children such as walking, biking, taking part in sports and movie nights, and roughhouses with St

Father has been employed with UPS for 21 years. He served in the military. His current shift is 3:00-4:00AM to 12:00-1:00PM. He just won a bid and has options for a different shift, in the event he gets primary custody of Child, so that he can take her to school. This would also give him a more normal sleep

17

schedule. He has had to get up at 2:30AM for 20 years. With a 9:00AM to 2:00PM schedule, he can drop the girls off at school and pick them up at 3:00PM.

Living Stones Academy has a reopening plan with COVID precautions. Father's new shift could be flexible if the school goes to a virtual teaching plan. Work is aware of Father's situation with Child ' and they are willing to be flexible.

L.S. has a very large family with many cousins in the age ranges of 2 to 13 years old. Child saw them several times each week prior to the pandemic. Father's parents live 20-25 miles away. They have not yet met L.S. because His mother gets unusually attached to Father's friends and if the relationship does not work out, she becomes heartbroken. Father wants to make sure the relationship is real before L.S. meets his mother. Father's father is a lineman having worked forty years for an energy company. His mother was a teacher. She tutors regularly. They live on a large farm with horses. Child loves riding. Father's brother Ti also lives there, as there are several houses on the farm. T uses medical marijuana for his anxiety, but not around Child . Father's family watches Child when he and L.S. are at work so he does not need child care. Father gets along well with M 's father, ( and with her siblings.

Father and Mother married on April 29, 2012, and Child was born in December of 2014. They lived outside of Grand Rapids. Mother wanted to get a job to get experience in her niche field. She could not get a job locally without having any experience. Mother told Father she was taking a job in Pennsylvania to get experience, and that she would be then come back. Father took Mother at her

18

word. As soon as Mother got to Pennsylvania, the struggle began. Mother did not tell Father where she lived. Mother filed for custody in Berks County and Father was awarded every other weekend. It was not a workable arrangement for Father but he did it anyway. Then, in 2019, he received shared custody with Mother. Mother's story about leaving is not true. Father could not have boxed her in with a vehicle. They are neighbors. Father was not home when Mother left. Father was on a two week deployment in the Army. Mother had told him she was going to leave, but Father told her not to. and he thought the matter was tabled. Father trusted Mother and thought the relationship was salvageable. Father took Mother at her word that she was coming back.

Father provided all of the transportation for child until the 2018 Order. Father recalls that he met D.K. in 2018. Initially, they had a good relationship. D.K. helped Father when his old car would break down. Then when Father entered D.K. 's house it became a big thing. Father arrived early to pick up child · D.K. was at work. Mother opened the door and went to get child, leaving the door open. Father took a step into the home, and Mother told him to leave, so he stepped back onto the porch. Mother called D.K. 's brother CK. and CK. watched Father from CK. 's car until Father left with child. D.K. became very angry and thought it was a ploy by Father. At another exchange, things were said that they now regret. Father wants to have a good relationship with D.K. like he does with LS. and C!.

19

Father attended a doctor's appointment for Child with Mother, and C.K. showed up. Father has had no difficulty with D.K.'s brother.

At the custody exchange, Father for the first time saw I D.K. carrying a gun. Father felt D.K. was brandishing it. Father admits that he "poked" D.K. and aggravated him, after which D.K. became very upset and loud. D.K. was threatening Father verbally, and then turned to his car and took his gun out of the holster. Father did not know what D.K. was going to do, so he took cover, got his weapon, but did not point it at D.K. . Father knows now that D.K. was simply putting his gun in his vehicle. D.K. told Father to back off and get out of his face. Father backed to his car, but D.K. came at him, so Father started filming. Father does this because it usually stops whatever activity is ongoing and everyone starts acting nicely. Child was behind him the entire time. D.K. tried to swipe Father's phone and hit Father in the face and made bumping moves. Mother got in between them and told D.K. that he was going to make her lose custody of Child

Mother has spoken to Father about D.K.'s relationship with Child, and how Child is timid and afraid that she is breaking the rules. Father has received texts from Mother that have Father concerned. Child was very upset about the blanket. Father had the same blanket and ordered one for Child.

Father used to be able to video chat with Child, but now he has to video chat prior to 1:00PM, when Father is at work. If Father calls D.K.'s phone, D.K. rarely responds. Last night, Father was able to chat. When Child is with

20

Father, Mother regularly chats with Child and Father never limits their time. Child needs both loving parents actively involved in her life. Father's communication with Mother was good but not now. Father believes that D.K. put the kibosh to this after Father walked into their home. D.K. no longer comes to custody exchanges in Ohio. Mother comes on her own with Child. Father does not believe co-parenting will work because of the incidents with D.K. Mother does not share anything with Father about Child. Father finds out from Child. Father would like to speak regularly with Mother so that they can co-parent and mutually exchange information. Father asked Mother about using "My Family Wizard" to communicate and received no response. Father is not perfect and there are areas he needs to work on. When Mother had her new baby, she asked Father to keep Child. Father and his mother were very excited and believed they received a gift. Child told Father about how Mother and D.K. had pulled her tooth out by slamming a door with a string tied to it. Father called Mother, and Mother admitted to it. Child was traumatized by this and was afraid Father would do the same when she had another loose tooth.

Father has attempted to work with Mother but it is like working with a brick wall. Child is happy, loveable and funny. She is very sensitive. She needs a lot of positive reinforcement. Father does things with her to make it fun, and then she is able to do them herself.

Father is concerned that Mother won't be around Child and Child will be with D.K. predominantly. Father does not think that D.K. will facilitate an

21

open co-parenting relationship. Father will lose Child and Child will not want to get to know her family in Michigan. D.K. has flaunted his relationship with Hazel and has her call him "daddy." D.K. has bragged to Father that he is going to be the "daddy" now.

In August of 2019, Mother texted Father to come and get Child right away. Mother would not say what the problem was. Father and Mother lives a 16 hours' drive apart. Mother did not say why or give any details. Father was very concerned and wondered about Mother's stability. Father was concerned Hazel was not in a safe environment.

L.S. is a very positive influence and gets along well with Child. Child often goes to L.S. for things. L.S. enrolled her in school. Living Stones Academy empowers students.

Father would like primary custody of Child and wants to enroll her in school in Michigan. Mother can have Child for the summer and during school breaks. Father can provide better stability and growth and Child can be around her family in Michigan. Father will change his work schedule and be with her all of the time.

On cross-examination, Father testified that Child 's muscular dystrophy is mild and she is not currently treated for it. She does need regular activity because she has loose joints and activity keeps her muscles from atrophying. C' 's wife is a physical therapist and she can work with Child. Child has a regular pediatrician in Michigan. Father regularly speaks with Mother. Father admits that

22

he wrote that 'Child' calls LS "momma Li ." Father admits that he knew Mother and Child were moving to Pennsylvania in 2017 and that Father did not go to court or to go get 'Child, although he did meet with an attorney at the time. Father did not have Mother's address. Father came at Christmas and stayed for a short period. The first time Mother filed for custody, Father was engaged to a woman named E . They did not live together, Father lived with his parents at that time, but he later moved in with E . That relationship ended in early 2018. Child met E and developed a bond with her. Child was sad when they broke up. Father dated other women but only introduced Child to one other beside E and LS. Father started dating LS. in July 2019. Father admitted that his mother has not met LS. and that is why he did not introduce them, because his mother gets more attached to his girlfriends than Child . Father is more worried about his mother than Child in this respect.

Child spends a lot of time with his mother and has her own bedroom there. His mother has room for all of her grandchildren. Father has 30 days to decide about the bid he won and change his schedule. He and LS. have a nanny if the need arises, but right now they have extended family. The trip to school will be 80 miles round trip. Father attempted to reach out to Mother about school options for Child but Mother never responds to Father's first attempts to reach out to her. Father cannot text her and they are not allowed to speak on the phone. Father prefers to talk face to face or on the phone or via FaceTime. It is chaotic to text or email and receive no response. Father and LS. will pay for Child 's school.

23

On re-direct, Father testified that he trusted Mother and did not file for divorce based on his religious convictions. Father thought they could work it out. Father is a Seventh Day Adventist Christian.

This Court must determine which custody arrangement is in the best interests of the child pursuant to the Child Custody law, codified at 23 Pa.C.S. §§ 5321 et seq. We must consider the testimony in light of the sixteen enumerated factors set forth in 23 Pa.C.S. § 5328(a). The Court has considered the evidence in light of each of these factors as well as any other relevant factors and concludes that it is in the best interests of the child for Mother to have primary physical custody during the school year, for Father to have partial custody during the summers, and for the parties to share legal custody.

Applying 23 Pa.C.S. § 5328(a), the first factor we must consider is which parent is more likely to encourage and permit frequent and continuing contact between the child and the other party. We find that Father is slightly more likely to encourage frequent contact. Mother moved to Pennsylvania with Child in 2017 and did not dispute Father's claim that he did not visit Child because he did not have Mother's address. When Mother gave him her address, he came to visit Child for Christmas. Since then, Father exercised his custody time and provided all of the transportation until recently. Every other weekend, he drove 32 hours round trip to see Child. He never refused to return Child to Mother and kept Child for extra time when Mother asked him to. The only thing he did was not to agree to give Mother one of his months in exchange for the month he kept Child at

24

Mother's request. Mother has ample FaceTime with child while with Father. Mother has limited Father's FaceTime with child by requiring Father to call prior to 1:00PM, when she knows he works from 3:00AM until 1:00PM. While Mother is obviously trying to prevent interaction between Father and D.K. i. the fact is that Mother is intentionally limiting Father's ability to communicate with child and is not providing some other solution so that Father may communicate with 'Child' when Father is home from work in the afternoon or evening. We note that Mother has never withheld the child from Father and has encouraged Father and Child to have a relationship otherwise.

The second factor is any past or present abuse or involvement by any county Children & Youth Agency. There is no agency involvement. Mother alleges that Father was abusive to her prior to Mother's move to Pennsylvania; however, this was raised for the first time at the custody trial, and not at any prior proceeding. Mother and D.K. also allege that Father verbally abuses them in front of child; likewise, Father alleges that D.K. has verbally assaulted him in front of Child. This must stop. This factor weighs slightly in favor of Mother.

The third factor is the parental duties performed by each party on behalf of the child. This factor currently weighs equally between the parents. Both parents take child to the doctor and attend to her needs. There is no evidence that one parent is better at it than another.

The fourth factor is the need for stability and continuity in the child's education, family life and community life. Father owns a home in Michigan and is

25

recently married. Child spends most of her time in Michigan with family. Because of the COVID shutdown, it is difficult for anyone to establish community involvement at this time. Father has had three women in his life whom Child. has met. Two she bonded with.

Mother has only had one significant person in her life since 2017, D K. Keip, and they are engaged to be married. Mother lives in a house with D.K. that is owned by D.K. 's brother. Mother is relying on the upcoming wedding to be able to purchase the house and get a mortgage. Prior to that, Mother rented two separate places to live since 2017. Mother has no family in Pennsylvania, although Child is close to D.K. 's family, and they treat her as their own. All of Father's family lives nearby in Michigan. As far as education, Child is just starting school this fall. Father is able to change his work shift to be with Child unless she is at school. Mother will be with Child for breakfast and to get Child ready for school. Child will be with 'D.K. after school until bedtime. There was no significant evidence that Mother will be able to switch her shift at work to spend more time with Child

Father is more stable in terms of residences, Mother is more stable in terms of having had only one significant relationship. Community involvement is practically zero at this time due to the COVID shut-down. This factor weighs equally.

The next factor is the availability of extended family to help with the children. This factor weighs in favor of Father. Mother and D.K. are not yet

26

married. Mother has no family in Pennsylvania. Child sees her paternal grandparents and cousins regularly.

The child did not express a preference and did not testify.

The factor of sibling relationships is weighted in favor of Mother. Child has a new half-sibling baby brother with Mother. Father does not have any other children.

The next factor is whether a parent has attempted to turn the child against the other parent. We find no evidence that either party is purposefully engaged in this sort of behavior at the present time. However, Father must stop making caustic remarks to and about Mother and/or D.K. , at any time, and particularly in front of Child This is a form of insidious parental alienation. Father testified that he recognizes that he intentionally pushes D.K. 's buttons to cause D.K. to explode, and that he then pulls out his phone camera "to get the behavior to stop." Father needs to seek counseling to learn how to stop engaging in this behavior which is harmful to everyone including the child. Likewise, D.K. is unable to control himself during these times, adding fuel to the fire. Both seem oblivious to the child during these times. This factor weighs in favor of Mother because of Father's intentional harmful statements to D.K. and about Mother in front of the child.

The next factor is which party is more likely to maintain a loving, stable, consistent and nurturing relationship with the child adequate for the child's emotional needs. We find that both are, except when Father is goading D.K. or

27

saying terrible things about Mother in front of the child. Father's and D.K.'s behaviors in front of the child are not acceptable. There is a reason that every custody order provides that no one is to speak ill of either parent in front of a child. This factor weighs in favor of Mother.

We find that Father is the parent more willing to attend to the daily physical, emotional, developmental and educational needs of the child. We were, frankly, shocked when we learned after Mother's case-in-chief had rested that the child has muscular dystrophy. While it may be mild, this is a condition that must be monitored and attended to. Mother made no mention of this condition. Mother must rely on a babysitter to help educate Child on the days she would be attending school at home, online, after Mother leaves for work at 1:00PM. Mother would be able to help educate Child earlier in the day, but Mother also has a young infant that she would have to attend to at the same time. Mother admitted that Child would need someone to sit with her and guide her through the online classes. Mother did not seem realistic about her plan to get everything done with Child's education as well as eating breakfast, lunch, going for a walk and having her son take a nap while Child has quiet time and watches a movie, prior to Mother leaving for work. As D.K. testified, many days depend on the children and how cooperative or uncooperative they are. Mother was willing to have the child's hearing tested and to get a second opinion.

Father is the parent who testified about Child's condition and the importance of keeping active and keeping her muscles from deteriorating. Father's

28

brother's wife is a physical therapist who can help Child. Father presented the re-opening plan for the Living Stones Academy, which he is willing to pay for as well as to take Child to school and pick her up along with L.S.1's daughter. Father's work schedule is flexible and Father testified that his long-time employer is willing to let him go part-time and to have adjustable hours to be able to do this and to be with Child. Father provided more testimony and evidence about how Child is a happy, funny and vivacious child. Mother's testimony tended to focus on how Child is developing a close relationship with D.K. 's family, Father's lack of cooperation, and issues with D.K. 1. Mother does attend to the daily needs of the child or sees that others provide those needs when Mother is not present.

As far as the proximity of the residences of the parties, the parties live 16 hours from each other, in two different states. Physical custody can no longer be shared now that Child is ready to start school.

As far as each parent's availability to care for the child or ability to make appropriate child-care arrangements, Mother can make appropriate care arrangements. There were no complaints about the babysitter, and D.K. 1 is not an inappropriate caregiver. D.K. has willingly offered to help care for Child and is learning how to raise children, as all parents must do. Mother relies on both the babysitter and D.K. 1 to care for Child when Mother is at work. Mother's time to care for Child is also now shared with another young child. Mother relies upon D.K. 1's family to help with Child as well, and they are obviously willing to do that and are fond of the child, but they are not yet family.

Father is willing to change to a part time position so that he can be with Child, except when she is attending school. Father also utilizes the paternal grandparents for child care. Father is often present as well. However, the fact that Father has not introduced his new wife L.S. to his mother, with the only explanation being that his mother grows very attached to people, and L.S.'s inability to explain it during questioning, is very strange. Father and L.S are married, and L.S. has never met the paternal grandmother. This Court could only wonder how Father is able to juggle separately his marriage and his mother. There is obviously some problem there. Father admitted that Child had bonded with his first fiancé, which did not work out. This factor weighs in favor of Mother.

The next factor is whether there is a credible concern of drug and alcohol abuse for either party. There is none.

There are no mental or physical concerns for either party or anyone in their household concerning the child, other than those already discussed.

Finally, the Court considers the factor of the level of conflict between the parties and their willingness and ability to cooperate with each other concerning the child. The level of conflict is high. Father says insulting things to Mother and D.K. 1. Father goads D.K. 1 into a rage and then films him on his phone camera. Mother does not want to communicate with Father as a result. Mother testified that Father does this all of the time. This must stop.

30

The custody exchange must be addressed. There shall be no guns worn, carried or drawn in Child s presence, during custody exchanges or at any other time. In all my years on the bench, this member of the Court has never heard such a story of guns being worn, drawn and aimed during an innocent child's custody exchange. No one seems concerned in the slightest about the impact of witnessing these events on Child I. Child loves both of her parents.

Father and D.K. appear to be the persons fueling the fire of animosity and rage. No one leveled any accusations at Mother along these lines, other than her failure to respond to Father's inquiries. Who can blame her?

Father, Mother and D.K. n needs to take whatever steps they need to take to end these frankly childish behaviors. Counseling, co-parenting counseling, parenting programs, mediation, Our Family Wizard – there are a myriad of professionals and programs available on the internet and in person to help parents and paramours and fiancés who cannot or will not or do not want to get along, learn to either accept and cope, and not to react. Father in particular needs to change his behaviors. The goading of another individual into rage is a terrible and insidious thing to do to another person. Father needs professional help to end his harmful behaviors which are being witnessed by the child.

For these reasons, we believe that Mother should have primary physical custody. Should either party wish to relocate after the date of entry of this Order, all parties need to be aware that our child custody statute has very strict relocation requirements. No relocation shall occur by one party unless the other party

31

consents. 23 Pa.C.S. § 5337(b)(1). If the other party does not consent, the relocating party must first seek approval from the Court prior to relocating. 23 Pa.C.S. § 5337(b)(2). There are strict notice requirements which must be followed as well. 23 Pa.C.S. § 5337(c). See also Pa.R.C.P. 1915.17.

Therefore we enter the following:

32